1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11  LUIS A. BOHORQUEZ,              )   No. EDCV 04-0900-SS
                                    )
12                Plaintiff,        )
                                    )   **MEMORANDUM DECISION AND ORDER**
13                v.                )
                                    )
14  JO ANNE B. BARNHART,            )
    Commissioner of the Social      )
15  Security Administration,        )
                                    )
16                Defendant.        )
    _____)

17

18        Luis A. Bohorquez ("Plaintiff") brings this action seeking to

19  overturn the decision of the Commissioner of the Social Security

20  Administration (hereinafter "Defendant," "Commissioner," or the

21  "Agency") denying his application for Disability Insurance Benefits and

22  Supplemental Security Income Benefits.  Alternatively, he asks for a

23  remand.  The parties consented, pursuant to 28 U.S.C. § 636(c), to the

24  jurisdiction of the undersigned United States Magistrate Judge.

25  Pursuant to the Court's Case Management Order, the parties filed a

26  joint stipulation ("Jt. Stip.") on May 25, 2005.  For the reasons stated

27  below, the decision of the Commissioner is AFFIRMED.

28  \\

**PROCEDURAL HISTORY**

On July 24, 2001, Plaintiff filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social Security Act.[1]  (Administrative Record ("AR") 80-83).  He alleged a disability onset date of August 15, 2000 due to social anxiety with myalgia and arthralgia. (AR 16).  The Agency denied Plaintiff's claim for benefits.  Upon Plaintiff's request, a hearing was held before Administrative Law Judge ("ALJ") Jacqueline S. Drucker, who issued a decision denying benefits on March 7, 2003 (AR 21).  Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied review on June 8, 2005, making the ALJ's decision the final decision of the Commissioner.  (AR 213-15).  Plaintiff subsequently commenced the instant action.

\\

\\

\\

---

[1]     DIB is a program that provides disability benefits to disabled workers who have achieved a "disability insured status," i.e., who have worked for a certain period of time and achieved an "insured status."  DIB is provided for pursuant to Title II of the Social Security Act.  See Harvey L. McCormick, Social Security Claims and Procedures, Chap. 8 and 18 (4th ed. 1991).  The statutory provisions governing SSI benefits are found at 42 U.S.C. § 1381 et seq.  SSI provides benefits for disabled individuals who are not covered under Title II or who are entitled to Title II benefits less than the amounts paid under SSI.  The determination of disability under Title XVI is similar to the disability determination under Title II.  However, unlike Title II, SSI does not require any showing of "disability insured status."  Harvey L. McCormick, Social Security Claims and Procedures, § 922 (4th ed. 1991).  Title XVI of the Social Security Act is codified at 42 U.S.C. §§ 1381-1385 ("Supplemental Security Income for Aged, Blind, and Disabled").

**FACTUAL BACKGROUND**

**A.   Plaintiff's Medical History**

Plaintiff was born on January 21, 1966 and was thirty-seven years old at the time of the hearing. (AR 64).  He completed high school and also attended a telecommunications trade or vocational school program. (AR 75).   His past work experience includes employment as a linen folder, machine shop worker, cable-telephone service technician, waiter, and laborer. (AR 16).  He claims that he became disabled on August 15, 2000 due to social anxiety with myalgia and arthralgia.  (AR 16, 60, 69).

Plaintiff's medical history includes treatment records from the Oakland County Community Mental Health Authority, El Centro "La Familia" ("El Centro"), where Plaintiff sought treatment for anxiety and paranoia on April 25, 2000.[2]  (AR 162).  Plaintiff reported during intake that he had used alcohol and marijuana within forty-eight hours and cocaine one month prior.  (AR 165-66).  In this initial evaluation, Plaintiff was assigned a Global Assessment of Function ("GAF") of 41 to 45.[3]  (AR 167).

---

[2]  Plaintiff also mentioned shoulder pain from working out too much, as well as pain on the lower right side of his abdomen.  (AR 163).

[3]  A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000) (hereinafter, "DSM IV").  A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "serious impairment in social,

3

While a patient at El Centro, from April 2000 to January 2001, Plaintiff was seen by Dr. Mainiaheen, who diagnosed him as having bipolar disorder and prescribed him Depakote, Risperdal, and Paxil. (AR 176, 181, 237).

On September 13, 2000, Plaintiff was admitted to the emergency facilities of the William Beaumont Hospital complaining he was suicidal as a result of panic attacks. (AR 172). Plaintiff was instructed to take his medications as prescribed, to continue to see his psychiatrist, and to seek follow-up if needed. (AR 179). On September 15, 2000, Plaintiff was admitted to the Common Ground Sanctuary, Crisis Screening Unit with the same complaint.[4] (AR 187). He reported alcohol and marijuana use within the previous two weeks, and cocaine use eight months prior. (AR 192). Plaintiff was discharged with instructions to not use alcohol and to take his medications as instructed.[5] (AR 202).

On January 23, 2001, Dr. Mainiaheen conducted another evaluation of Plaintiff. Again, Dr. Mainiaheen found Plaintiff had Bipolar Disorder Mixed Type, and a history of substance abuse. (AR 240). Plaintiff reported that he had not taken drugs or alcohol for three and a half months. (AR 238). Dr. Mainiaheen assigned Plaintiff a GAF score of 55

---

occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV at 32-34.

[4] Plaintiff also mentioned left shoulder pain and right knee discomfort. (AR 198).

[5] Plaintiff was prescribed Benadryl and Klonopin in addition to Depakote and Risperdal. (AR 202-03).

4

to 60.[6]   He further noted that Plaintiff's prognosis was fair if he continued to follow psychiatric treatment and stay away from drugs.  (AR 240).

From September 2001 to February 2002, Plaintiff was a patient with the Riverside County Department of Mental Health, where he was treated by Dr. Kari Enge, among others.[7]  By this time, Plaintiff had stopped taking Depakote, Risperdal, and Paxil because he felt they were not working.[8]  (AR 306, 309, 360).  Later reports, however, indicate that Plaintiff showed "some improvement" in response to his medications.[9]  (AR 335-41).   In addition, Plaintiff continued to consume alcohol and use drugs, despite his doctor's advice to the contrary.   In the reports for September 25 and October 19, 2001, Plaintiff indicated that he occasionally drank beer, enough to get "smashed," and used marijuana. (AR 344, 349).   On November 16, 2001, Plaintiff reported that he had worked for a "couple of days" for an ad agency, and that he was working on a screen play.  (AR 341).  A January 29, 2002 report indicated that it had been one month since Plaintiff's last substance use.  (AR 378).

---

[6]  A rating of 51-60 on the GAF scale indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  See DSM IV, at 34.

[7]  The records indicate that Plaintiff was also seen by clinicians David Schoelen, Barbara Levy, and Lynn Larson.  (AR 336).

[8]  For a three week period in September 2001, Plaintiff was prescribed Xenedrine.  (AR 359).

[9]  A report dated February 1, 2002 indicates that Plaintiff was taking Zyprexa.  (AR 367).

On February 1, 2002, Dr. Enge, a doctor with Riverside County Mental Health, filled out a form on which she diagnosed Plaintiff with Psychotic Disorder, Impulse Control Disorder, and Social Anxiety Disorder. (AR 367). Dr. Enge marked boxes finding that Plaintiff cannot maintain a sustained level of concentration, cannot sustain repetitive tasks for an extended period, cannot adapt to new or stressful situations, cannot interact appropriately with co-workers and authority figures, and cannot complete a forty-hour work week without decompensating. (AR 367). Unlike Plaintiff's other doctors, however, Dr. Enge failed completely to address the impact of Plaintiff's substance abuse on his symptoms. (See AR 367). Finally, given the options "stable," "chronic," "guarded," or "very guarded," Dr. Enge found Plaintiff's prognosis to be "chronic," the second best prognosis of the four options. (AR 367).

### B. __Consultative Examinations__

Plaintiff underwent multiple consultative examinations. In a February 15, 2001 report, Dr. Sydney Joseph, who conducted a psychiatric review, found that Plaintiff had Bipolar Disorder Mixed and a history of polysubstance abuse. (AR 221). He assessed Plaintiff's GAF at 55 to 60. (AR 221). He further found that Plaintiff was able to perform simple unskilled work. (AR 226).

On March 6, 2001, Dr. Habib Gennaoui, who performed an orthopedic evaluation for the State of Michigan Disability Determination Service, issued a report regarding Plaintiff's exertional limitations. Dr. \\

6

Gennaoui found that Plaintiff's back pain "somewhat limited" his physical activity. (AR 232).

On October 1, 2001, Dr. Laurence Meltzer, an orthopedic surgeon, submitted a summary of an orthopedic evaluation completed at the Diamond Medical Group. Although Plaintiff complained of myalgia and arthralgia, the examination did not substantiate these claims. (AR 303). Overall, Dr. Meltzer found that Plaintiff did not have any functional limitations resulting from orthopedic problems. (AR 303).

On October 11, 2001, Dr. Reynaldo Abejuela, a doctor with the Diamond Medical Group, submitted a complete psychiatric evaluation of Plaintiff. At the evaluation, Plaintiff admitted to using marijuana, speed, and cocaine, but he claimed to not have used them for the past "several weeks." (AR 307). He also admitted to drinking five beers per week. (AR 307). Plaintiff indicated that he had stopped taking his prescription medications, Depakote, Risperdal and Paxil, approximately five or six months prior because they did not work. (AR 306, 309). He further reported that he was not seeing a psychiatrist, although he was seeing a therapist at an outpatient clinic twice a month. (AR 306). Plaintiff described his hobbies as "playing the drums, boxing, writing, bodybuiliding, football, and reading." He informed Dr. Abejuela that he handles his own money and "gets rides" for transportation. Plaintiff described his daily activities as "chores, reading, and writing." (AR 307).

Dr. Abejuela concluded that Plaintiff's occupational and social functioning are not severely impaired, and there are no severe

restrictions to his daily activities.  (AR 310).  Dr. Abejuela also stated that "[t]here are no severe limitations due to emotional impairment as long as he continues to abstain from drugs and alcohol." (AR 310).

Finally, on November 1, 2001, Dr. Tashjian, a psychiatrist, evaluated Plaintiff's medical reports.  He concluded that Plaintiff "retains the capacity to perform simple repetitive tasks with minimal social contact."  (AR 328).

### C.   Plaintiff's Testimony

On February 20, 2003, a hearing before the ALJ was held.  (AR 419). At the hearing, Plaintiff testified that for over one year prior to March 2001, he worked on and off for a temporary job placement agency in Michigan.  (AR 422).  From March 2001 to around September 2002, Plaintiff again worked on and off for a temporary job placement agency, this time in California.  (AR 425).  None of the temporary positions in California lasted longer than one week.  (AR 425).  Finally, beginning around September 2002, and lasting at least through the time of the hearing, Plaintiff was employed as a delivery driver.  (AR 420). Plaintiff further testified that during the period of relative unemployment, from March 2001 to September 2002, his condition was essentially the same as it was on the day of the hearing.  (AR 431). Plaintiff also testified to the fact that he lives with his mother, who he helps with finances as well as chores.  (AR 427-28).

\\

With regard to his mental conditions, Plaintiff testified that, at the time of the hearing, he was managing his bipolar and social anxiety disorders, and was not taking any medications.[10]   (AR 428).   Plaintiff also stated that he had a substance abuse problem with cocaine, but that he had not used cocaine during the last two months.   (AR 428, 434). However, he also testified that when he has trouble getting a long with others, he "self-medicate[s]," meaning he "drinks."   (AR 433).

### D.   **Medical Expert's Testimony**

Dr. Joseph Malancharuvil, a medical expert, testified at the February 20, 2003 hearing.   Dr. Malancharuvil testified that Plaintiff suffers from a mild underlying anxiety disorder and problematic personality traits.[11]   (AR 436).   He found that Plaintiff is not limited in daily activities, and has no problems with cognitive functions or deterioration at work.   However, Dr. Malancharuvil found that Plaintiff has mild difficulties in social functioning.   (AR 436).   He testified that Plaintiff should not work with hazardous, fast-moving machinery while taking drugs, and Plaintiff should not work in safety operations due to his anxiety disorder.   (AR 436).   Otherwise, Dr. Malancharuvil found that Plaintiff did not have any limitations, and did not qualify for a listing for the period of April 1, 2001 to September 30, 2002. (AR 435-36).

\\

---

[10]   Plaintiff testified that he still suffers from panic attacks, but that he is able overcome them using coping mechanisms.   (AR 431-32).

[11]   Plaintiff's problematic personality traits include that he is self-centered, anxious, obsessive, and mildly impulsive.   (AR 437).

Dr. Malancharuvil further testified that Plaintiff's substance abuse contributed to his inability to sustain employment. (AR 437). He also stated that Plaintiff's unstable mood resulted from cocaine use and created the suspicion of bipolar disorder. (AR 437).

### E.   **Vocational Expert's Testimony**

Ms. Sandra Fioretti testified at the February 20, 2003 hearing as a vocational expert. The ALJ proposed a hypothetical involving a claimant who is physically unlimited, and non-exertionally could perform either unskilled or minimally semi-skilled jobs not involving the safety of others, teamwork, or dealing with the public. (AR 440). Ms. Fioretti found that such a claimant could perform Plaintiff's previous job of folding linens. (AR 440). In addition, the ALJ questioned Ms. Fioretti regarding Plaintiff's employment as a delivery driver. Ms. Fioretti testified that Plaintiff's delivery job is semi-skilled, light work and does not involve the safety of others or more than casual public contact. (AR 440-41). Ms. Fioretti also testified that a claimant with impulse and temper control difficulties, irritability, who may misinterpret the actions of others, and who may not perform work in a timely manner would be unable to sustain employment. (AR 441).

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him

from engaging in substantial gainful activity[12] and that is expected to result in death or to last for a continuous period of at least twelve months. <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the

_____

[12]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

11

1  claimant is found disabled.  If so, the claimant is found

2  not disabled.

3

4  Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d

5  949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b) -

6  404.1520(f)(1) & 416.920(b) - 416.920(f)(1).

7

8       The claimant has the burden of proof at steps one through four, and

9  the Commissioner has the burden of proof at step five.  Bustamante, 262

10  F.3d at 953-54 (citing Tackett).   Additionally, the ALJ has an

11  affirmative duty to assist the claimant in developing the record at

12  every step of the inquiry.  Id. at 954.  If, at step four, the claimant

13  meets his burden of establishing an inability to perform past work, the

14  Commissioner must show that the claimant can perform some other work

15  that exists in "significant numbers" in the national economy, taking

16  into account the claimant's residual functional capacity,[13] age,

17  education, and work experience.   Tackett, 180 F.3d at 1098, 1100;

18  Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

19  The Commissioner may do so by the testimony of a vocational expert or by

20  reference to the Medical-Vocational Guidelines appearing in 20 C.F.R.

21  Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").

22  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing

23  Tackett).  When a claimant has both exertional (strength-related) and

24  nonexertional limitations, the Grids are inapplicable and the ALJ must

25  take the testimony of a vocational expert.   Moore v. Apfel, 216 F.3d

26  _____

27       [13]   Residual functional capacity is "what [one] can still do

28  despite [his] limitations" and represents an "assessment based upon all
   of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**THE ALJ'S DECISION**

ALJ Drucker concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 15). At the first step, the ALJ proceeded as though Plaintiff did not work after the alleged disability onset date, even though Plaintiff had a total of four months of substantial gainful activity as a linen folder and a machine operator. (AR 16-17). At the second and third steps, the ALJ found that Plaintiff suffers from anxiety disorder, with mixed personality traits and episodic polysubstance abuse, which she found to be severe but not sufficient to meet a listed impairment. (AR 18). The ALJ also found that, although Plaintiff has a history of myalgia and arthralgia, he does not have a significant medically determinable physical impairment.

Next, at step four, the ALJ found Plaintiff's testimony was inconsistent and only established a moderate degree of limitation. (AR 19). Moreover, she found that to the extent Plaintiff's limitations were more severe, they were caused by his ongoing polysubstance abuse. (AR 19). The ALJ went on to note that she gave little weight to the treating psychiatrist Dr. Enge's 2002 report because it was "marked and extreme" compared to the "rather mild objective findings" of the other prior treating sources. (AR 19). Having stated this, the ALJ found Plaintiff had a residual functional capacity for at least unskilled nonpublic work that does not involve the following: group work, more

1  than casual public contact, safety concerns, or high production quotas.

2  (AR 19).   The ALJ then concluded that based on Plaintiff's residual

3  functional capacity, and the testimony of the vocational expert, he

4  could perform his past relevant work as a linen folder and a delivery

5  driver.   (AR 19).   Accordingly, the ALJ found that Plaintiff was not

6  disabled, as defined in the Social Security Act, at any time through the

7  date of the decision.   (AR 20).

8

9                        **STANDARD OF REVIEW**

10

11      Under  42  U.S.C.  §  405(g),  a  district  court  may  review  the

12  Commissioner's decision to deny benefits.   The court may set aside the

13  Commissioner's decision when the ALJ's findings are based on legal error

14  or are not supported by substantial evidence in the record as a whole.

15  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing

16  Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th

17  Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

18

19      "Substantial evidence is more than a scintilla, but less than a

20  preponderance."   Reddick, 157 F.3d at 720 (citing Jamerson v. Chater,

21  112 F.3d 1064, 1066 (9th Cir. 1997)).   It is "relevant evidence which a

22  reasonable person might accept as adequate to support a conclusion."

23  Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).   To

24  determine whether substantial evidence supports a finding, the court

25  must "'consider the record as a whole, weighing both evidence that

26  supports  and  evidence  that  detracts  from  the  [Commissioner's]

27  conclusion.'"   Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2

28  F.3d 953, 956 (9th Cir. 1993)).   If the evidence can reasonably support

                                14

either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**DISCUSSION**

**A.    <u>The ALJ Gave Specific And Legitimate Reasons For Rejecting The Treating Psychiatrist's Opinion</u>**

Plaintiff contends that the ALJ improperly disregarded the opinion of his treating psychiatrist, Dr. Enge. Specifically, he asserts that the ALJ failed to consider Dr. Enge's opinion that Plaintiff had "no ability to maintain a sustained level of concentration, sustain repetitive tasks for an extended period, adapt to new or stressful situations, or interact appropriately with others." (Jt. Stip., at 3). Plaintiff argues that the ALJ failed to provide a legitimate and specific rationale for rejecting this opinion.[14] (Jt. Stip. at 5).

Generally speaking, the court must attribute greater weight to the opinions of treating physicians because they are hired to treat the patient and consequently have more interaction with the individual. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989) (citing <u>Spraque v. Bowen</u>, 812 F.2d 1226, 1230 (9th Cir. 1987)). However, while a

---

[14]    Plaintiff further contends that the ALJ's reference to the "other treating source prior to 2002" is not sufficiently specific. (Jt. Stip. at 4). However, since Plaintiff was only treated at El Centro and the Riverside County Department of Mental Health, it appears that the ALJ was referring to El Centro where Plaintiff was treated by Dr. Mainiaheen.

15

treating physician's opinion may be entitled to more deference, it is
not entirely conclusive as to the question of disability.  Magallanes,
881 F.2d at 751 (citing Rodriquez v. Bowen, 876 F.2d 758, 761-62 (9th
Cir. 1989)).  The ALJ may choose to disregard or give less weight to a
treating physician's opinion, so long as he "make[s] findings setting
forth specific, legitimate reasons for doing so that are based on
substantial evidence in the record."  Magallanes, 881 F.2d at 751
(quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

       In her decision, the ALJ provided specific and legitimate reasons
for giving less weight to Dr. Enge's opinion.  (AR 19).  First, she
found that Dr. Enge's opinion was "marked and extreme" and inconsistent
with the "mild" findings of the consultative psychiatric examiner and
the other treating source.  (AR 19).   The ALJ also noted that Dr.
Enge's opinion was weak because it failed to acknowledge Plaintiff's
ongoing polysubstance abuse, a factor which every other evaluator noted
in their opinions.  (AR 19).  As these reasons are specific, legitimate,
and supported by substantial evidence in the record, the Court finds ALJ
Drucker properly gave less weight to Dr. Enge's opinion of disability.

       Plaintiff argues that ALJ Drucker should have adopted Dr. Enge's
findings.  (Jt. Stip. at 3).  Specifically, Plaintiff focuses on Dr.
Enge's statement that Plaintiff had "no ability to maintain a sustained
level of concentration, sustain repetitive tasks for an extended period,
adapt to new or stressful situations, or interact appropriately with
others." (Jt. Stip. at 3).  Dr. Enge's report, however, is an extremely
limited, one-page form document.  Moreover, Dr. Enge's findings, as
reflected in the report, are completely inconsistent with Plaintiff's

16

medical history as well as his lifestyle. (AR 367). The form requires the treating psychiatrist to assess Plaintiff's ability in multiple categories. For example, it states "ability to: maintain a sustained level of concentration" and then provides the treating psychiatrist the option of circling either "yes" or "no." (AR 367). Dr. Enge circled the "no" option with regard to whether Plaintiff was able to "maintain a sustained level of concentration," "sustain repetitive tasks for an extended period," "adapt to new or stressful situations," and "interact appropriately" with co-workers, supervisors, and authority figures. (AR 367). She circled "yes" with regard to whether Plaintiff was able to "interact appropriately" with family and strangers. (AR 367). ALJ Drucker properly gave these conclusions little weight as they are largely inconsistent with the rest of Plaintiff's recorded medical history.

The testimony of a medical expert may serve as substantial evidence, so long as it is supported by the record evidence. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995); <u>see also Morgan v. Comm'r of the Soc. Sec. Admin.</u>, 169 F.3d 595, 602 (9th Cir. 1999); <u>Magallanes</u>, 881 F.2d at 752 (explaining that the ALJ did not rely on the medical expert's testimony by itself to reject the treating physician's opinion). Dr. Malancharuvil, a medical expert, testified at Plaintiff's hearing that Plaintiff had "no limitations functioning, no problems with cognitive functions and deterioration in work setting as a result of mental problems is taken to be none." (AR 436). He further noted that the fact that Plaintiff moved from job to job is "not psychiatrically related." (AR 436). Dr. Malancharuvil's testimony is supported by the record.

17

Consulting psychiatrists, Drs. Joseph and Tashjian, independently found Plaintiff to be only mildly limited in his daily activities and social functioning, and moderately limited in his ability to concentrate. (AR 219, 326). Both doctors also evaluated Plaintiff's abilities with regard to specific categories and tasks.[15] (AR 224-26, 330-32). In their more detailed analysis, both doctors found Plaintiff to be only mildly to moderately limited. (AR 224-25, 330-31). Similarly, Dr. Abejuela, who also conducted a psychiatric evaluation, concluded that Plaintiff's occupational and social functioning are not severely impaired. (AR 310).

In comparison, because she provides no information beyond circling "yes" or "no," it is unclear from Dr. Enge's narrative report the extent to which she believed Plaintiff was limited in his ability to perform the noted tasks. (See AR 367). In fact, Dr. Enge's narrative report does not contain any objective criteria in support of her conclusions. Under diagnosis she merely lists: "Psychotic Disorder, Impulsive Control Disorder, and Social Anxiety Disorder." (AR 367). Under comments, she simply states, "Long history of many short-term jobs that ended because he thought co-workers were hostile. Has temper-control-problems. Low stress-tolerance." (AR 367). Dr. Enge does not provide objective support for these descriptions or for her circled responses. It should

---

[15]   For example, in the category of "Sustained Concentration and Persistence," they assessed Plaintiff's ability to carry out very short and simple instructions, detailed instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, and so forth. (AR 224-25, 330-31). There were some minor differences in the doctors' reports for the more in depth evaluation, however, both doctors ranked Plaintiff similarly and both found he only had mild to moderate limitations. (AR 224-25, 330-31).

also be noted that Dr. Enge had only treated Plaintiff for a short period at that point, from September 25, 2001 to February 1, 2002. (AR 367).

Other evidence in the record also suggests that Dr. Enge's conclusions are questionable. For instance, Plaintiff stated that his hobbies are "playing the drums, boxing, writing, bodybuilding, football, and reading." (AR 307). In addition, he handles his own money, and he assists his mother with household chores and shopping. (AR 307, 427-28). These activities are inconsistent with the "marked and extreme" limitations reflected in Dr. Enge's report.

ALJ Drucker also states in her decision that she gave Dr. Enge's report less weight because it ignores Plaintiff's history of polysubstance abuse. At several evaluations, as well as during his hearing testimony, Plaintiff admitted to continuing drug and alcohol abuse. (See, e.g., AR 165-66, 192, 237-38, 278, 344, 349, 360, 378, 428, 433-34). Dr. Mainiaheen, who treated Plaintiff for part of 2000 and 2001, noted in his reviews that Plaintiff initially had poor compliance and a history of polysubstance abuse. (AR 237, 254). In addition, Dr. Mainiaheen described Plaintiff's prognosis as "fair" if among other things, Plaintiff stayed away from drugs. (AR 240). Moreover, Dr. Malancharuvil, the medical expert, testified that Plaintiff's substance abuse contributed to his inability to sustain employment as well as his mood instability. (AR 437). Yet, Dr. Enge failed to even mention this obvious and critical aspect of Plaintiff's medical history. (AR 254, 310, 367). This Court agrees with ALJ Drucker that Dr. Enge's failure to acknowledge Plaintiff's polysubstance

19

abuse means that her opinion is entitled to less weight than the consultative psychiatrists' and medical expert's opinions.

Accordingly, the ALJ did not err in according less weight to Dr. Enge's opinion.  The ALJ provided specific and legitimate reasons for weighing the medical opinions as she did, and the overwhelming concurrence between the consultative evaluations and the medical expert's testimony serve as substantial evidence for the ALJ's conclusion.

**B.    The ALJ Posed A Complete Hypothetical Question To The Vocational Expert**

Plaintiff next argues that the ALJ failed to include the limitations from his treating psychiatrist, Dr. Enge, in the hypothetical provided to the vocational expert.  (Jt. Stip. at 9). Plaintiff asserts that failure to include these limitations falls short of the requirement that the hypothetical consider all of Plaintiff's limitations.  (Jt. Stip. at 9).

At step four of the sequential evaluation, claimants have the burden of showing that they can no longer perform their past relevant work.  20 C.F.R. § 404.1520(e).  Although the burden of proof lies with the claimant at step four, the ALJ "still has a duty to make the requisite factual findings to support his decision."  Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citing Social Security Ruling ("SSR") 82-62).  The ALJ must look at the "residual functional capacity and the physical and mental demands" of the claimant's past

1  work in making findings of fact as to the past work's requirements.   20

2  C.F.R. § 404.1520(e); SSR 82-62.

4      In her written decision, the ALJ concluded that Plaintiff had the

5  residual functional capacity for "at least unskilled nonpublic work not

6  involving more than casual contact with the public, high production

7  quotas, responsibility for the safety of others, or work in a group."

8  (AR 19).  This assessment is consistent with the medical evidence in the

9  record.   Based on her residual functional capacity findings, the ALJ

10 concluded that Plaintiff could return to his past relevant work as a

11 linen folder and a delivery driver.  (AR 19).

13     If the ALJ finds that a plaintiff can return to his past relevant

14 work, the testimony of a vocational expert is not necessary.  "If the

15 claimant is <u>unable</u> to perform his past work and has significant non-

16 exertional limitations, then the testimony of a vocational expert is

17 required to demonstrate the existence of specific jobs that the claimant

18 is capable of performing despite these restrictions."  <u>Polny v. Bowen</u>,

19 864 F.2d 661, 663-664 (9th Cir. 1988)(emphasis added).  From this rule,

20 it is clear that a vocational expert is <u>not</u> required where the ALJ finds

21 Plaintiff can return to his past relevant work.  Even though the ALJ

22 questioned the vocational expert at step 4, it is irrelevant given that

23 the ALJ is under no obligation to call on a vocational expert if the ALJ

24 finds that Plaintiff can return to his past relevant work.  <u>Matthews v.</u>

25 <u>Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993) (explaining that since

26 Plaintiff failed to show he was unable to return to his previous job,

27 the burden of proof remained on Plaintiff and the vocational expert's

28 testimony was thus useful but not required).  Preliminarily, the Court

finds that because the ALJ ultimately concluded that Plaintiff could return to his past relevant work, the vocational expert's testimony was not required and irrelevant to the ultimate conclusion.  However, even analyzing the case as though the testimony of the vocational expert was necessary, no error occurred.

Plaintiff urges that the ALJ submitted an incomplete hypothetical to the vocational expert.  (Jt. Stip. at 9).  This argument is without merit as the ALJ's findings and the hypothetical posed to the vocational expert were consistent with the findings of consultative evaluators and were substantially supported by the record.  Moreover, the ALJ included all of the limitations that she found to exist.

In order for the vocational expert's testimony to constitute substantial evidence, the ALJ must pose hypothetical questions that "consider all of the claimant's limitations."  Andrews v. Shalala, 53 F.3d 1035, 1043-1044 (9th Cir. 1995) (citing Magallanes, 881 F.2d at 756); Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988) (explaining the ALJ must pose hypothetical questions that "set out all the limitations and restrictions of the particular claimant").  An ALJ is required to pose hypothetical questions to a vocational expert based upon medical assumptions supported by substantial evidence in the record that reflect the claimant's limitations.  Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir. 2001).  If the hypothetical question is not supported by the record and does not reflect all of the claimant's limitations, then the vocational expert's testimony that claimant has a residual working capacity has no evidentiary value.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1988).  Therefore, if the hypothetical posed to the

vocational expert is supported by the record and reflects all of Plaintiff's limitations, it is proper.

Even if the Court was to assume that the vocational expert's testimony was necessary, the ALJ properly summarized and included all of Plaintiff's non-exertional limitations in her hypothetical to the vocational expert. The ALJ's hypothetical described the claimant as unlimited physically, and non-exertionally "able to perform either unskilled or minimally semiskilled jobs. . . where he should not be doing jobs that involve the safety of others and where he should not be involved in jobs where he's working as part of a team, not dealing with the public." (AR 440). As discussed above, these assumptions were supported by the record and reflect all of Plaintiff's limitations. Thus, the vocational expert's opinion was based upon a complete and accurate hypothetical.[16]

\\
\\
\\
\\

---

[16]   The vocational expert opined that the ALJ's hypothetical claimant could still perform work folding linens. She also testified that Plaintiff's current position as a delivery driver does not involve the safety of others more than is required to maintain a valid California driver's license. The vocational expert further testified that the delivery driver position does not involve more than just casual contact with the public. (AR 440-41). However, the vocational expert also responded that a claimant could not sustain employment if he had difficulty with impulse and temper control, as well as difficulty with showing up on time and performing at a competitive pace. (AR 441).

1

2                                   **CONCLUSION**

3

4        Consistent with the foregoing, IT IS ORDERED that Judgment be

5   entered AFFIRMING the decision of the Commissioner and dismissing this

6   action with prejudice.   IT IS FURTHER ORDERED that the Clerk of the

7   Court serve copies of this Order and the Judgment herein on counsel for

8   both parties.

9

10  DATED: February 13, 2006.

11

12                                  _____\s_____
                                    SUZANNE H. SEGAL
13                                  UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        24